STATE OF VERMONT
ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| | } | |
| Appeal of Bren | } | Docket No. 68-4-04 Vtec |
| (Eardensohn 4-lot subdivision) | } | |
| | } | |

## Decisions on the Merits

Paul and Victoria Eardensohn applied for a municipal permit for a four-lot subdivision of their 16.6± acre parcel of undeveloped land along German Flats and Sugarbush Woods Roads in Warren. Their neighbor, Robin Bren, objected to the Eardensohns' subdivision when it was considered by the Town of Warren Development Review Board ("DRB") and appealed to this Court when the DRB gave final approval to the Eardensohns' subdivision on March 17, 2004. The parties also disputed the character and location of the portion of Town Highway #55 known as Sugarbush Woods Circle, which dispute was ultimately resolved by the Washington Superior Court.[1] This Court delayed consideration of the subdivision permit appeal until the Superior Court resolved the town road dispute.

In the course of preparing this appeal for a de novo merits hearing, the parties filed motions for summary judgment and to limit the evidence presented at trial. The Court denied these motions in Decisions dated September 25 and 28, 2007, with one exception: in granting the Eardensohns partial summary judgment, the Court dismissed Appellant Bren's Question 2, which challenged the validity of the subdivision permit because of alleged but unspecified omissions in who received notice of the DRB hearing. Thus, the sole issues remaining for our review in this appeal are contained in Appellant's Question 1, with its subsets (A) through (K), inclusive, all of which contest the ability of the proposed subdivision to conform to the subdivision review provisions and standards of Articles 6 and 7 to the Land Use and Development Regulations for the Town of Warren, Vermont ("Regulations").

The Court conducted a trial over the course of two days, which was preceded by a site visit with the parties and their attorneys.[2] Based upon the evidence admitted at trial, together with supplemental filings made post trial at the Court's request, all of which was put into context

---

[1] See Bren v. Eardensohn, et al., Docket No. 320-5-05 Wncv (Teachout, J., Jan. 22, 2007).

[2] Appellant Robin Bren is represented in these proceedings by Lauren S. Kolitch, Esq.; Appellee-Applicants Paul and Victoria Eardensohn are represented by Paul S. Gillies, Esq. and Charles L. Merriman, Esq. The Town of Warren ("Town") has not entered an appearance in these proceedings.

by the site visit, the Court renders the following Findings of Fact, Conclusions of Law and separate Judgment Order:

## Findings of Fact

1.      Applicants[3] wish to subdivide their 16.6± acre parcel of undeveloped land into four lots, as depicted in the site plan prepared by their engineer, Bannon Engineering of Waitsfield, Vermont.  A reduced copy of Applicants' site plan is attached to this Decision, solely for illustration purposes; the attached reduced copy of the site map is not to scale and was later revised in some minor respects, to conform with trial testimony.  A full scale copy of Applicants' site plan was admitted into evidence at trial as Applicants' Exhibit 19.  At the Court's request, Applicants filed a revised site plan, certified by their engineer, which conforms to the engineer's trial testimony.  We have labeled this revised site plan Exhibit 19-Revised.  We address the propriety of referencing this revised site plan in ¶ 22, below.

2.      The property is in the vicinity of the Sugarbush Resort, a recreational mountain area. Applicants' property lies within the Vacation Residential Zoning District ("VR District"). Appellant does not contest in this appeal that the proposed subdivision conforms to the applicable dimensional requirements.  See Regulations Table 2.5(D).

3.      The property has road frontage on German Flats Road and at two locations along Town Highway #55, the first location being at its junction with German Flats Road, where TH #55 is known as Sugarbush Wood Road, and later between the 10:00 o'clock and 1:00 o'clock parameters of the terminus of TH #55, where it is known as Sugarbush Woods Circle.

4.      Applicants made several revisions to the details of their subdivision as it was being considered by the DRB.  Their site plan (Exhibit 19) and its last revision (Exhibit 19-Revised[4]) incorporate all those revisions.  As revised, the four lots would be of the following sizes: Lot 1: 2.8± acres; Lot 2: 3.2± acres; Lot 3: 4.4± acres; and Lot 4: 6.2± acres.

5.      Appellant Bren's property is entirely within the Circle at the terminus of TH #55; it consists of about one acre and is improved with a single family home.  Appellant and her family have owned this property for many years.  It is similar in size and frequency of use to most neighborhood homes.

---

[3]  Title to the subject property is held solely in the name of Victoria Gadd Eardensohn.  Her husband, Paul Eardensohn, has assisted in the presentation of their subdivision application, both before the DRB and this Court.

[4] See Finding 1, above, and 22, below.

**Shared driveways**

6.      Lots 1 and 2 would share a driveway accessed from the lower (easterly) part of Sugarbush Woods Road, near where that Road intersects with German Flats Road.  During trial testimony, Appellant acknowledged that she does not directly contest the design of this shared driveway and the Lots it serves, particularly in relation to conformance with Regulations Articles 6 and 7.[5]

7.      Applicants propose to access Lots 3 and 4 by way of a second shared driveway, to be located between 12:00 and 1:00 o'clock on the terminus portion of TH #55, known as Sugarbush Woods Circle.  This second shared driveway would be in the general location of a pre-existing logging road on Appellants' property.

8.      Appellants propose to expand, re-grade and improve this logging road so that it may be used as the shared driveway for Lots 3 and 4.

9.      The main disputes in this appeal arise due to the shared driveway for Lots 3 and 4, the related development and its access onto Sugarbush Woods Circle.  The area includes several steep slopes, including on Lots 3 and 4, their shared driveway and the northwest quarter of Sugarbush Woods Circle.

**Stormwater Run-off**

10.      Due to the sometimes steep slopes on Lots 3 and 4, the pre-existing logging road intersects Sugarbush Woods Circle at about a sixty degree angle that presently directs vehicles coming from the logging road towards the northwest quarter of Sugarbush Woods Circle.  The logging road then travels up the incline on what would be Lot 3, first in a northeasterly and then in a northwesterly direction, so as to scale the incline on Lot 3 and towards Lot 4.

11.      The logging road has existed for some undetermined time.  Within the last several years, Applicants made some improvements to the logging road.  One consequence of these improvements was that more stormwater ran along the logging road and its ditches and off of Applicants' property onto Sugarbush Woods Circle, causing some disturbances to the road, particularly in the winter, when ice would form.  There was also some testimony at trial about damage caused to neighboring properties by water run-off, but this testimony was inconclusive.

---

[5] Appellant did express a concern that if the Court approved Lots 1 and 2, and their shared driveway, Applicants could modify their proposed development in a way that would allow this shared driveway to also serve as access for Lots 3 and 4.  Because we intend to only pass judgment on the application that is before us, we do not consider partial approval of Applicants' proposed development, nor a modification that Applicants have yet to present.

12.     After Applicants' improvements to their logging road, the Town sought to mitigate the problems caused by water run-off by installing a stormwater culvert somewhere on the easterly portion[6] of Sugarbush Woods Circle.  This culvert directs stormwater running along the Circle's northeasterly road ditch to run under the Circle and onto the roadway easement portion of Appellant's property, where the stormwater is broadly disbursed.  While there was evidence of silt and sand deposits at the exit of this culvert, the convincing trial evidence showed that there has not been material damage to Appellant's property caused by stormwater running off of Applicants' property, particularly since the Town installed this stormwater culvert.

13.     Applicants propose extensive improvements to this logging road so that it may be used as the shared driveway for Lots 3 and 4.  They propose to install three stormwater culverts under the shared driveway that would divert water from west to east, so as to divert stormwater from running down the driveway and its ditches and onto the Circle portion TH #55.  These culverts will be placed in the lower portion of the shared driveway, about 100 feet apart, and will generally cause the stormwater to be disbursed onto the lower portion of Lot 3; there improvements should minimize the potential of stormwater from Appellants' property causing damage to adjoining properties or town roads.  In this regard, the Court found most credible the testimony of Applicants' engineer.

14.     The currently existing logging road is passable, but not in sufficient condition to accommodate the proposed development.  Applicants propose to "cut and fill" along the logging road so that no portion of the finished driveway between Sugarbush Woods Circle and the Lot 3 turn off would exceed a fifteen percent (15%) grade.  Assertions by Appellant's engineer that the shared driveway would have finished grades of twenty-two percent (22%) or more were later disproved by Applicants' engineer.

15.     The cut and fill excavation along the proposed driveway will result in several earthen or rock-lined embankments, at least one of which could be up to ten (10) feet in height.  The earthen embankments will respect a 3:1 slope; the rock-lined embankments will respect a 2:1 slope.  In the areas of these embankments, the total area cleared may be up to seventy-five (75) feet wide.

---

[6]  Applicants' site plan (Exhibit 19) locates this stormwater culvert at about 2:00 o'clock on Sugarbush Woods Circle.  Trial testimony, put into context by the site visit, proved this to be inaccurate; the stormwater culvert is between 3:00 and 4:00 o'clock on Sugarbush Woods Circle.

16.     During construction of the driveway improvements, Applicants will cause silt fencing and other erosion control measures to be employed, all as depicted on the revised site plan (see Findings ¶ 22, below), which will minimize the potential for erosion and silt-laden stormwater run-off to migrate off site. Disturbed areas will be seeded and mulched, where necessary.

**Traffic safety**

17.     Sugarbush Woods Circle is a town-maintained, Class III roadway. It is located on sometimes steep slopes; its northwest quarter is particularly steep and narrow. This portion of the Circle can be particularly treacherous in the winter. During heavy snows, town workers have found it difficult to plow. There have been occasions when town employees have been unable or unwilling to navigate town equipment up the western half of the Circle and could only keep this portion of the road clear by plowing down the Circle from the east. In fact, the Town used to not maintain the western portion of the Circle in the winter time, instead only clearing snow from the eastern portion of the roadway, just past Appellant's easterly driveway. The town has maintained the entire Circle roadway since the mid 1990's.

18.     The shared driveway for Lots 3 and 4, being at about 1:00 o'clock on the Circle, is nearly equidistant from the bottom of the Circle (6:00 o'clock), where it junctions with the portion of TH #55 known as Sugarbush Woods Road. The Circle's northwest quarter has slopes as steep as twenty-two percent (22%) and narrows to a width, particularly at about 10:00 o'clock on the Circle, where it is difficult or impossible for two passenger vehicles to pass one another. The safer and more developed section of the Circle is to the east.

19.     The Chief of the Town of Warren Volunteer Fire Department initially proposed certain conditions (see two page attachment to Fire Chief Hartshorn's February 17, 2004 letter, copies of which were admitted at trial as Exhibit 11) to mitigate the safety concerns posed by development of property served by this narrow, steep section of town highway.

20.     One of the Fire Chief's recommendations was for Applicant to investigate the feasibility of blasting and excavating the northwest quarter of the Circle, so that the grade of this portion of the roadway could be reduced to no more than fifteen percent (15%). Appellant expressed concerns about this proposal, due to the extensive presence of ledge near and under the roadway and the proximity to a community water supply system (see Findings ¶ 31, below). Applicants later concluded that this road work was not feasible and chose to adopt the Fire Chief's alternate proposal that a permit condition require the installation of pressurized sprinkler systems (see Findings ¶ 32, below) in any homes on Lots 3 and 4.

21. Applicants have addressed safety concerns with the following components of their site plan, some of which were incorporated into a revised plan after Applicants received recommendations proposed by town officials and concerns expressed by Appellant:

(a) the width of the shared driveway, as it intersects Sugarbush Woods Circle, would be increased to eighty-five (85) feet;

(b) the shared driveway would dip away from the Circle at its intersection, at a slope of no less than three percent (3%), so as to discourage any stormwater traveling down the driveway from continuing onto the Circle roadway and also to conform to the traffic safety recommendations of the Vermont Agency of Transportation. See AOT Standards for Residential and Commercial Drives ("AOT B-71 Standard"), a copy of which was attached as Exhibit G to Appellant's expert's Civil Engineering Study (trial Exhibit A).

(c) Sight distances from the shared driveway intersection with the Circle are adequate. Sight distances from the driveway to the east exceed the minimum sight distance recommendations in the AOT B-71 Standards; while the sight distances from the driveway to the west do not meet the recommended minimum of 280 feet (the actual sight distance was credibly estimated to be 210 feet), the fact that one can see on-coming traffic through the interior of the Circle leads us to conclude that the westerly sight distances are adequate. Our conclusion was also influenced by the following facts: (i) someone traveling from the shared driveway is more likely to use the easterly portion of Sugarbush Woods Circle, as the road is wider and less steep; (ii) the easterly portion of the Circle is closer to the junction with Sugarbush Woods Road; and is more developed; and (iii) traffic is infrequent on the western half of the Circle.

(d) no turning radius within the shared driveway or onto the Circle would have an interior radius of less than thirty (30) feet, thereby allowing delivery, fire and other trucks to safely travel to and from Lots 3 and 4 by using the more safe portion of TH #55 on the eastern half of the Circle;

(e) the interior end of the shared driveway, located on Lot 4, would have a "hammerhead" terminus, thereby allowing an area for delivery, fire and other trucks to safely turn around on the interior of the Lot; the revised driveway spur to the future Lot 3 house would also provide an adequate turn-around area for these trucks;

(f) a "turn out" will be constructed along the lower portion of the shared driveway, to provide a safe passage way for vehicles;

(g) the traveled portion of the shared driveway would be maintained and plowed to a width of eighteen (18) feet, thereby exceeding the Fire Chief's recommendation of sixteen (16) feet; and

(h) Applicant will have the ditch on the northerly edge of Sugarbush Woods Circle cleaned out and deepened, particularly near the shared driveway, so that stormwater within the ditch will flow more freely and not cause ice to form on the roadway, and will increase the length of the existing culvert now under the logging road, to accommodate the driveway improvements.

22.     During the course of trial testimony, it became clear that the then-current site plan (Exhibit 19) did not accurately depict the current location of the driveway on Appellant's property.  During direct and cross examination, Applicants' engineer also clarified specifics concerning the shared driveway and agreed to modify the turn-outs to the Lot 3 and 4 house sites and include further detail to the driveway improvement finished grade elevations.  The Court directed that Applicants cause their engineer to incorporate these corrections into a revised site plan, to be submitted to the Court, in certified form, post-trial.  The Court has reviewed this revised site plan, finds that the revisions made are limited to those specifically disclosed during the engineer's testimony and has marked the revised site plan as Exhibit 19-Revised.  The Court concludes that this revised site plan conforms to the testimony offered at trial by Applicants' engineer.[7]

23.     The Circle marks the end of TH #55.  Like may Class III town highways in Vermont, TH #55 experiences infrequent traffic.  TH #55 experiences even less traffic than most Class III town highways, since it cannot be used as a through way to another location.  The undisputed testimony at trial was that the Circle portion of TH #55 is "rarely traveled."

**Character of neighborhood settlement patterns**

24.     The area is rural in character; the surrounding neighborhood is mostly wooded.  The only development along Sugarbush Woods Circle is residential in character, although development becomes more intensive as one approaches the nearby Sugarbush Resort.  While there was some testimony at trial of one or more nearby residents who occupy their properties year-round, the majority of homes are seasonal.  Appellant testified that she and other members of her family use her property on an infrequent basis, which appears common for the neighborhood.

25.     While the pending application only seeks authority to subdivide the property, Applicants disclosed that the future development of the individual lots would be for residential purposes only.  Applicants propose that the individual lots would remain mostly wooded.  Building envelopes are depicted on the site plan (Exhibits 19 and 19-Revised show identical building envelopes).  No clear cutting would occur outside of the building envelopes and the areas

---

[7] In her post-trial memorandum, Appellant asserts that it is improper for the Court to rely upon the revised site plan (Exhibit 19-Revised) that the Court directed Applicants to file post-trial.  Because we conclude that the revised site plan merely reflects the revisions and corrections to which Applicants' engineer testified at trial, we conclude that requesting and relying upon the revised site plan was within the Court's discretion and mirrors the common practice of appropriate municipal panels.  See also V.R.E.C.P. 2(e) ("evidence, not privileged, that is not admissible under the Rules of Evidence may be admitted in the discretion of the court if it is of a type commonly relied upon by reasonably prudent persons in the conduct of their affairs.").

designated for the water supply and waste disposal systems. These characteristics conform to the neighboring properties and their development.

## Aesthetics, including landscaping and utilities

26. At the suggestion of the DRB, Applicant revised their site plan so that the building on Lot 2 would be set farther back in the lot. The lots will remain mostly wooded, in keeping with general aesthetic qualities of the immediate neighborhood.

27. Outside lighting will be minimal and only from downcast fixtures and will not be likely to cause undue glare onto neighboring properties. Because of the alignment of the upper shared driveway with Appellant's house, headlights from vehicles traveling down the shared driveway will shine onto Appellant's property. But the period during which these headlights will shine onto Appellant's home will be brief, and the estimated use of the shared driveway will make these instances infrequent.

28. Electrical, telephone, cable and other utility lines will be buried in or along the shared driveways and will therefore not have an additional aesthetic impact. There will be minimal independent corridors for the utility line placements.

29. No primary or secondary conservation areas are located within or adjacent to Applicant's property, as defined in Regulations §§ 7.3(B) or (C). While the subject property may have some areas with grades between 15% and 25%, the trial evidence did not disclose any specific areas which would meet the § 7.3(C) definition for secondary conservation areas.

30. Area residents occasionally use Sugarbush Woods Circle for walking. As noted above, traffic on the Circle is relatively infrequent. Applicants' proposed subdivision will not have a measurable impact upon the ability of area residents to use and enjoy walks on the Circle.

## Impact upon shared neighborhood well

31. Appellant and up to four of her neighbors use a community well and pump station located on Applicants' property, in the vicinity of the northwest quarter of Sugarbush Woods Circle. As many as twelve nearby homes were once served by this community well, but several home owners chose to stop using the community well and, witnesses presumed, installed their own water supply system on their own property. There may be more neighboring properties entitled to access the community well, though deeded easements, but the undisputed evidence was that no more than five nearby homes are currently served by the community well.

32.     When the DRB considered Applicants' subdivision plan, the Fire Chief suggested that Applicants explore the feasibility of reducing the grade of the northwest quarter of Sugarbush Woods Circle. Because of the presence of ledge in that area, that work would require blasting, perhaps of a significant nature. With this suggestion in mind, Appellant became concerned that the nearby community water supply well would suffer and perhaps fail.

33.     Applicants determined that the work necessary to reduce the grade of the northwest quarter of Sugarbush Woods Circle made it not feasible and thereafter elected to conform to the Fire Chief's alternate suggestion of installing pressurized sprinkler systems in the proposed homes on Lots 3 and 4.

34.     Appellant remains concerned that the excavation and other development work proposed for Lots 3 and 4 will possibly interfere with the community water supply systems. Appellant proposes no new development or activity within 400± feet of the community water supply well. Applicants' subdivision, as proposed, is unlikely to have any impact upon this community well. State authorities reached the same conclusion, as is evidenced by the March 1, 2004 letter from the State regional engineer (Exhibit 8).

**Impact upon community services and facilities**

35.     Negotiation of the western quarter of Sugarbush Woods Circle will continue to present occasional challenges to travelers on that Class III public highway and to the Town road crew called upon to maintain it, particularly during winter storms.

36.     The traffic generated by this subdivision is unlikely to materially increase those challenges, particularly since only two of the proposed homes will use Sugarbush Woods Circle for access.

37.     The Town has consistently maintained the eastern half of the Circle; it represents the more safe travel way to both Appellant's property and the upper two lots of the proposed subdivision. The western half of the Circle is less safe, has been used less in the past and is less likely to be used for access to the upper lots in the future.

38.     Applicant has revised their site plan to widen the mouth of the upper shared driveway to eighty-five (85) feet at its cut onto Sugarbush Woods Circle. The width and driveway layout affords a minimum of a thirty (30) foot turning radius and as much as a forty-two (42) foot turning radius, thereby allowing fire trucks and other municipal vehicles to better navigate and access the upper driveway from the eastern portion of the Circle.

39.     Town snow plows and graders that travel on the western half of the Circle, particularly during storms, will continue to experience a sometimes dangerous passage, whether this proposed subdivision receives approval or not, for so long as the road is allowed to remain in its current state.  The minimal additional traffic that this subdivision could contribute, whether the two upper residences are seasonal or permanent homes, is unlikely to create an added undue burden on municipal facilities or create an unreasonable demand for public services.

**Water supply and wastewater disposal**

40.     All residences on the proposed lots will be served by individual wells and water supply systems.

41.     The residence proposed for Lot 1 will be served by an individual waste disposal system, located on Lot 1.  Lots 2, 3 and 4 will be served by a community waste disposal system, located on Lot 2.  The community waste disposal system will be gravity fed and of the "in-ground" variety; the Lot 2 system will be of the pressurized, mound variety.

42.     The water supply and waste disposal systems have been approved by the Vermont Agency of Natural Resources, Department of Environmental Conservation, as evidenced by "Wastewater System and Potable Water Supply Permit WW-5-2250", a copy of which was received into evidence as Exhibit 7.

43.     There was no credible evidence offered at trial that the proposed subdivision, including its water supply and waste disposal systems, will have an adverse impact upon the other area residential water supply or waste disposal systems.

## Discussion

We are asked in this <u>de novo</u> appeal to determine whether the pending subdivision application should be approved.  In considering the pending application, we are instructed to disregard the determination appealed from, at least as to the factual and legal issues that have been preserved for our review in this appeal.  See <u>Chioffi v. Winooski Zoning Bd.</u>, 151 Vt. 9, 11 (1989) ("A de novo trial 'is one where the case is heard as though no action whatever had been held prior thereto.'") (quoting <u>In re Poole</u>, 136 Vt. 242, 245 (1978)). We therefore begin our analysis with a determination of what issues we are charged with addressing.

Appellant here most recently filed an amended Statement of Questions, which primarily focuses upon the application's conformance with certain specific provisions of the subdivision review procedures and performance standards contained in Regulation Articles 6 and 7.  But

before we consider those specific provisions, we feel it appropriate to summarize the procedural record of the pending application, so as to give context to our review.

Applicants first filed for subdivision approval in November of 2003. Their application has always proposed a four lot subdivision; only minor changes have been proposed in any lot boundary lines of building envelopes. Pursuant to the Article 6 subdivision review procedures, the DRB noticed and conducted its first review of this application at a public hearing held on January 7, 2004. At that hearing, the DRB voted to classify this proposed subdivision as a "minor subdivision," pursuant to Regulations Article 6.1(C). This determination was not preserved by Appellant in her last Amended Statement of Questions and is therefore a final determination that Applicant's proposed subdivision is minor in nature. See 24 V.S.A. § 4472(d) (making final unappealed decisions of appropriate municipal panels).

In following the general review procedures of Article 6, the DRB conducted two more public hearings on the subject subdivision application (February 18 and March 3, 2004). At its March 3rd public hearing, the DRB voted on several specific approvals for the subject application, the last of which was a final subdivision approval for the four lot subdivision. The DRB issued its written decision on or after March 17, 2004, which lists the specific conditions upon which the DRB final subdivision approval was based. Applicants filed no cross appeal to the DRB's conditional approval. Therefore, the DRB-imposed conditions remain the law of this case, subject to the success of the issues Appellant preserved for our review in this appeal. Id.

Appellant suggests in the introductory sentence of her Question 1 that her specific challenges to the pending application are to its conformance with Articles 6 and 7. But our review of the eleven subsets to Appellant's Question 1 (subsets (A) through (K), inclusive), with the one exception noted below, all appear to be limited to challenges under Regulations §§ 7.2, 7.5, 7.6 and 7.8. We take each of Appellant's Questions in turn.

**Conformance with General Standards of Regulations § 7.2**

Appellant challenges in her Question 1(A) whether Applicants' property can be subdivided as proposed "without danger or adverse impact to the neighboring properties and/or the character of the area affected . . . ." In Question 1(B), Appellant questions whether "the subdivision, as laid out, maintain[s] reasonable road layout and building locations and/or lot area and configuration." While somewhat difficult to discern which specific provisions of Article 7 give rise to Appellant's first two Question, we understand that they are most closely aligned with the standards reflected in Regulations §§ 7.2(A), (C) and (D). In light of the Findings noted

above and the further discussion below, we conclude that the proposed subdivision conforms to these general and specific subdivision standards.

Applicants' property is in the VR District, the purpose of which is to "allow the development of residential development at moderate densities, and the establishment of limited commercial uses related to the tourism industry, in close proximity to Sugarbush Resort." Regulations Table 2.5(A). The neighborhood most immediate to Applicants' property has a consistent level of residential development, particularly in the area east of Sugarbush Woods Circle. Applicants' property appears to be the largest parcel of undeveloped land in the neighborhood, other than the other lands to the north and west of the Circle. In proposing four home sites on more than sixteen acres, Applicants have proposed a density no greater than that evidenced on neighboring properties. In fact, we note that Appellant's property consists of about one acre, all within the Circle. It was originally comprised of two lots; some of Appellant's expressed concerns regarding the pending subdivision application were based upon a possible adverse impact upon Appellant's ability to further develop her own property.

The proposed subdivision conforms to the dimensional standards for the VR District and is consistent with the surrounding neighborhood development. If Applicants were proposing a more intense development on their sixteen acres, our conclusions here may be different. But the relatively low intensity of the proposed subdivision is within the character of the land and the surrounding properties.

Appellant's Question 1(B) challenges the reasonableness of Applicants' road layout, building locations and lot configurations. Applicants' subdivision design conforms to, and exceeds, all District setback requirements and positions the building envelopes to minimize their aesthetic impact on the neighborhood. While municipalities often prefer developments to use a minimum of road curb cuts, the two shared driveways Applicants employ minimize the impact the four proposed homes may have on any one area of TH #55.

Resort communities often experience developments upon steep slopes and ridgelines. While the subject subdivision needed to address some steep slopes of the pre-existing logging road, Applicants and their engineer have provided a design that limited the slopes of the shared portion of the driveway to no more than 15%. The building envelopes are not located on ridgelines; with the exception of the occasional vehicle headlights that Appellant may observe, the proposed development is unlikely to materially change the character and nature of the surrounding neighborhood.

For these same reasons, we have become unconvinced that that the proposed subdivision will cause the adverse impacts Appellant itemizes in her Question 1(J) as well.

**Conformance with the stormwater management & erosion control standards of Regulations § 7.5**

Appellant asserts in her Questions 1(C) and (D) that the proposed subdivision will create "unreasonable" and "unacceptable" stormwater run-off, siltation and pollution, including that which will cause an "inevitable" adverse impact upon Appellant's property. Such concerns are reasonable when any neighbor is attempting to ascertain the possible impacts for development in an area, such as here, where there are narrow and steep town roads and the development itself includes some steep slopes. But we conclude here that Applicants have considered those impacts and taken the necessary design steps to minimize the potential for adverse impacts upon Appellant and their other neighbors.

One is left to wonder if Appellant's concerns would still exist if the steep and narrow conditions on the northwest quarter on Sugarbush Woods Circle were not present. The outcome of this appeal may be different if that section of the Circle provided the only access to Applicants' property. The fact that Applicants' recent upgrades to the logging road resulted in an increase of stormwater flowing off their property and onto the roadway provides a reasonable foundation for Appellant's concerns. But her concerns omit the cure that resulted from the Town's action of installing a culvert on the eastern side of the Circle. While this culvert directs stormwater onto the lower portion of Appellants' property, the credible evidence showed that stormwater from Applicants' property no longer is causing material damage to the Town roadway or neighboring properties. The improvements to the logging road, so that it may serve as a shared access for Lots 3 and 4, will provide more certainty and control to the stormwater flowing off of Applicants' property. Narrow, steep roads, ice and stormwater run-off will continue to be characteristics of this neighborhood. But the evidence received at trial convinced the Court that Applicants and heir engineer have incorporated best management practices to their erosion control and stormwater management plans. The proposed subdivision is unlikely to increase the adverse impacts upon Appellant and her property.

Appellant's Question 1(E) ponders whether the proposed subdivision has "met all requirements of Article 7, Sections 7.5 (A and B) . . . ." Based upon the evidence presented, we understand that our Findings and the discussion above have addressed all of Appellant's challenges that are premised upon Regulations §§ 7.5 (A) and (B). Applicants have appropriately "fit" the proposed building envelopes into their property's topography; their

proposed lots are served by shared driveways; they have minimized the tree cutting on the property, thereby employing the natural vegetation to diffuse stormwater run-off, especially where they propose to install new culverts under the driveway shared by Lots 3 and 4, so as to direct stormwater onto other portions of their own property and away from Appellant's and their neighbors' properties. We discern no areas where the proposed subdivision does not conform to the standards of Regulations §§ 7.5 (A) and (B).

**Conformance with Community Services and Facilities Standards of Regulations § 7.6**

Appellant's Question 1(K) challenges the project's conformance with the fire safety and emergency access requirements. We presume that this challenge is based upon the subdivision standards contained in Regulations § 7.6. We conclude that the subdivision, as represented by Applicants' engineer's trial testimony, which was thereafter incorporated into the revised site plan now labeled Exhibit 19-Revised, does conform with the Regulation § 7.6 standards.

Town plow trucks and regional ambulances have had difficulty navigating Sugarbush Woods Circle, particularly its western half, and especially in the winter or during mud season. Anecdotal testimony offered at trial included an ambulance getting stuck and a plow truck tipping over in that section of the Circle. This subdivision will not resolve the question of whether reducing the grade and widening that portion of the road will eliminate those perils, since the necessary blasting of ledge and possible damage to the nearby community well made that work infeasible. If Applicants chose not to widen the base of the upper shared driveway, so as to provide the needed turning radius for cars, truck and other vehicles to access Lots 3 and 4 from the eastern portion of Sugarbush Woods Circle, traffic to and from those Lots would have been directed to the less safe portion of the Circle. But the revisions to the site plan now allow for safe passage of traffic.

As an added defense against possible losses to fire, Applicants have agreed that any homes constructed on Lots 3 or 4 would have pressurized sprinkler systems installed prior to occupancy. Such systems are not an adequate sole response to possible loss by fire, but they can slow the spread of fire, so as to allow a greater response time by municipal fire protection and other emergency services. As designed, revised and with this added condition, we conclude that the proposed subdivision conforms to Regulations § 7.6

**Conformance with Roads & Pedestrian Standards of Regulations § 7.7**

Appellant challenges by her Question 1(F) whether the proposed subdivision conforms to the "applicable road standards, including the minimum design standards such as the right of way in width, the required width of lanes and shoulders, maximum road grade, intersection grade maximum, minimum corner visibility standards, safety for neighboring property owners and pedestrians, and related road safety and traffic Town of Warren regulatory provisions . . . ." Based upon this verbiage, we take these concerns to be premised upon the road and pedestrian standards contained in Regulations § 7.7.

We believe it first important to note the narrowness of our review under § 7.7. Applicants are not proposing a new "public road." Regulations § 7.7(A). They are not proposing a private road that may "provide suitable access to, or accommodate, anticipated future subdivision." Id. Were Applicants proposing just one less lot, the standards contained in § 7.7 would not even apply to their development. The § 7.7 road and pedestrian standards control subdivisions many times larger than that proposed here; many of the § 7.7 provisions are not applicable to Applicants' subdivision due to its relatively small size and low intensity.

Since each of the two shared driveways serve no more than two lots, it occurs to us that the § 7.7 standards do not even govern this development. "The standards contain herein shall apply to all . . . private roads serving four or more lots." Id. Nonetheless, due to the total number of lots proposed (four), the Court received evidence, including expert testimony, on conformance of the proposed shared driveway for Lots 3 and 4[8] with the road and pedestrian standards, including the standards established by the Vermont Agency of Transportation, known as the B-71 Standards and the A-76 Standards for road construction. See Regulations § 7.7(C).

Once revised, the upper shared driveway conforms to these road standards. The base of the shared driveway will now be wide enough to accommodate vehicles needing a thirty-foot turning radius; a portion of the driveway base will accommodate a vehicle needing a forty-two foot turning radius. The design of the driveway base, where it intersects with Sugarbush Woods Circle, conforms to the AOT B-71 Standards. No portion of the driveway that will be shared by Lots 3 and 4 will have a slope of greater than 15%.

---

[8] At trial, Appellant did not contest Applicants' assertion that the shared driveway serving Lots 1 and 2 complied with the Regulations, subject to the design characteristic that it serves only those lots.

This development is compatible with development in the surrounding neighborhood; it is unlikely to cause material impacts upon the surroundings. The occasional traffic the development of Lots 3 and 4 will add to Sugarbush Woods Circle is unlikely to interfere with those who enjoy walking the neighborhood Circle. We conclude that the subdivision as currently designed will be unlikely to cause the adverse impacts Regulations § 7.7 seeks to guard against and otherwise conforms to the applicable standards in § 7.7.

**Accuracy of site plan, its revision and supporting documents**

Appellant wonders in her Question 1(G) whether the supporting documents Applicants submitted "contain[] accurate information, . . . including but not limited to the location of the Town road, the location of the intersection of the subdivision's intersection with the Town road, the grades, elevation and slope of the proposed lots and access road, road profile, and the topography of the site." We are uncertain upon which provision of Articles 6 or 7 this Question is based. But since it challenges the very reliability of Applicants' supporting documents, we believe it important and proper to consider Appellant's Question 1(G).

The Washington Superior Court is the proper forum to determine the accuracy of the character and location of the challenged portion of TH #55, known as Sugarbush Woods Circle. It did so in its decision of January 22, 2007.[9] Specifically, the Superior Court determined that while portions of the town roadway had "migrated," it remained located within the right-of-way reflected in the Roth survey (our trial Exhibit 17). We understand that Applicants' revised site map (Exhibit 19-Revised) includes depictions of the road and right-of-way that conform to the Superior Court ruling. If it does not, we condition our determination here upon a requirement that Applicants' site plan be revised further to do so.

There was much disagreement concerning actual or proposed slopes of what will be the shared driveway for Lots 3 and 4. We concluded that Applicants' engineer provided convincing testimony on the finished slopes of the shared driveway, and the added safety benefits that the "hammerhead" turnout on Lot 4 would bring. Trial testimony revealed that Applicants' site plan (Exhibit 19) incorrectly showed the eastern edge of Appellant's driveway; it is closer to where the Lots 3 and 4 shared driveway will be. It is for these reasons that the Court directed Applicants to cause their engineer to supply a revised site plan, post trial, which accurately depicted his trial testimony. We concluded that this revised site plan, which we have labeled

---

[9] See Footnote 1, above.

Exhibit 19-Revised, accurately incorporates the site plan revisions Applicants' engineer testified to at trial, but no more.

During and prior to trial, Appellant and her engineer raised some substantial and well founded concerns, particularly related to the finished grade and layout of the shared driveway for Lots 3 and 4. In rebuttal, Applicants and their engineer addressed these concerns with clarifications and some revisions. We are not aware of any basis remaining for Appellant's assertion in Question 1(G) that the pending applicant and supporting documents contain materially inaccurate information.

## Protection of the Community Well (Regulations § 7.8)

We are again left to wonder upon which specific subdivision standard(s) Appellant's Questions 1(H) and (I) are based. While Regulation § 7.8 speaks mostly to the standards that must be met by the water supply and waste disposal systems that will serve the proposed subdivision, it also directs that "[t]here shall be no adverse impact on existing water supplies from the proposed water supply for the subdivision." While Appellant's initial concerns were well founded, particularly in light of the possible blasting that would occur to reduce the grade of the northwest quarter of Sugarbush Woods Circle, we received no credible evidence that either the proposed wells within the subdivision, nor the excavation work that will occur within Lots 3 and 4, will have any material adverse impact upon the existing community water supply, now located on the southwest corner of Lot 4.

In this regard, we also note that Applicants have secured a state permit for their proposed on-site water supply and waste disposal systems. In the course of their review of Applicants' state permit application, state officials were called upon to assess the possible impact upon the community well that serves Appellant and four of her neighbors. See Exhibit 8. We are not called upon to review the sufficiency of Applicants' water supply and waste disposal systems; that issue was not preserved for our review in this appeal. However, in response to Appellant's specific queries in her Questions 1(H) and (I), we conclude that Applicants' proposed subdivision, including the proposed water supply and waste disposal systems, will not likely cause a material adverse impact upon the adjoining community water supply well.

## Conclusion

Based upon the above, this Court concludes that, for the factual and legal issues preserved for our review in this appeal, and respecting the factual and legal determinations

rendered by the DRB that were not appealed,[10] Applicants' proposed four lot subdivision will conform to the applicable provisions of Regulations Articles 6 and 7, with the additional condition that any home constructed on Lots 3 and 4 must include a pressurized fire suppression sprinkler system, in accordance with the applicable state and municipal regulations for such residential sprinkler systems.

Given that these proceedings mark the final determination (subject to rights of appeal) on this minor subdivision application, this proceeding is remanded to the Town of Warren Zoning Administrator to complete the ministerial act of incorporating all applicable conditions from this appeal and the unchallenged portion of the March 17, 2004 DRB conditional determination.

This completes the current proceedings pending with this Court. A Judgment Order accompanies this Decision.

Done at Newfane, Vermont this 12th day of August, 2008.


_____
Thomas S. Durkin, Environmental Judge

---

[10] The parties' post-trial filings evidence a squabble concerning the appropriateness of including a conditional use review within our analysis of this subdivision application. We are not aware of any challenge to the apparent DRB determination that this application did not require conditional use review. We have therefore declined to include the same in the completion of our review of this final subdivision approval.